NOT FOR PUBLICATION                                          CLOSED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

LISA MASKEVICH,                       :
                                      :
                Plaintiff,            :       Civil Action No. 07-5841 (JAP)
                                      :
        v.                            :
                                      :
MICHAEL J. ASTRUE,                    :
COMMISSIONER OF SOCIAL                :       **OPINION**
        SECURITY                      :
                                      :
                Defendant.            :
_____:

PISANO, District Judge:

        Before the Court is the appeal of Lisa Maskevich ("Claimant") from the final decision of

the Commissioner of the Social Security Administration ("Commissioner") denying her request

for Title II Social Security Disability Insurance ("SSDI") benefits and for Title XVI

Supplemental Security Income ("SSI") benefits based on disability.  The Court has jurisdiction to

review this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3) and decides this matter without oral

argument.  See Fed. R. Civ. P. 78.  The Court finds that the record provides substantial evidence

supporting the Administrative Law Judge's ("ALJ") decision that Claimant is not disabled.

Accordingly, the Court affirms the Commissioner's decision.

## I.      BACKGROUND

        Claimant was born on June 14, 1961.  (Administrative Record ("R") 108).  She has a high

school education.  (R. 6).  Claimant worked as a laboratory service person, a cashier, a cook, and

most recently as a part-time assistant line cook at Denny's Restaurant.  (R. 165).  She has not

worked since April of 2000.  (R. 33).  She asserts that she became disabled on October 1, 1999.

(R. 34).

A.     <u>Procedural History</u>

Claimant filed applications for disability insurance benefits on December 20, 1999, the

date on which she alleges she became disabled due to chronic neck and shoulder pain.  (R. 137).

The Social Security Administration denied Claimant's claims both initially and upon

reconsideration.  (R. 120).  Upon Claimant's request, a hearing was held before ALJ Joel H.

Friedman on February 15, 2001, during which Claimant provided testimony.  (R. 123).  On

November 9, 2001, ALJ Friedman issued a written decision denying Claimant's claim.  (R. 270).

The Appeals Council denied Claimant's request for review of the hearing decision on November

1, 2002.  (R. 4).  Claimant appealed the Commissioner's final decision on December 17, 2002.

(R. 288).  Claimant argued that the ALJ erred in steps three through five of the five-step Social

Security Regulation analysis.  (Pl.'s Br.  15-18).  On appeal, Judge Thompson of the U.S. District

Court for the District of New Jersey found that the ALJ erred at steps three, four, and five.

(R. 291-296).  Accordingly, on March 20, 2004, Judge Thompson vacated and remanded the

ALJ's November 9, 2001 decision to the Commissioner.  (R. 284).  The Appeals Council vacated

the decision and remanded it to the ALJ for further proceedings consistent with Judge

Thompson's opinion.  (R. 270).  At the time of remand, the Appeals Council became aware that

Claimant had filed a subsequent claim for Disability Insurance benefits on January 15, 2002 and

received a favorable decision by another ALJ on April 25,  2003.  *Id*.  The second ALJ found

Claimant disabled as of November 10, 2001, instead of November 9, 2001, the disability onset

date determined by the ALJ Friedman.  *Id*.

In the present appeal, ALJ Friedman found that the Claimant did not establish a disability during the period from October 1, 1999 to November 9, 2001.  (R. 283).  The ALJ found no reason to reopen the subsequent decision. (R. 271).  Thus, the ALJ affirmed the Commissioner's decision that the Claimant was not disabled at any time from October 1, 1999 through November 9, 2001.  (R. 283).

**B.**      **Factual History**

**1.**      **Claimant's Previous Employment**

Claimant's past relevant work history includes her eleven years as a lab service person, seven months as a car wash cashier, and one year as a line cook.  (R. 165).  She explained at the hearing before the ALJ, that while working, she was required to stand and make repetitive motions with her hands to count money, make change, and prepare food. (R. 39).  Her most recent job required her to use a toaster and boil water for four-hour shifts. (R. 38).  She testified that she was unable to lift pots because she dropped them due to numbness in her left hand. (R. 32).  Although co-workers often assisted her with strenuous lifting, she was subjected to increased pain when there were fewer than three people in the kitchen.  (R. 10).  In her work history report, Claimant indicated that her job required little heavy lifting.  (R. 166).  She testified that she stopped working in April of 2000 because the repetitive motions required for work caused pain in her neck and shoulder and numbness in her left hand.  (R. 31-32).

**2.**      **Claimant's Daily Activities**

According to her testimony at the hearing, Claimant lives in a house with her daughter. (R. 31).   During the day, she spends time with her four cats and three dogs, and visits her sister

and mother.  (R. 42).  She is uncomfortable driving because her left hand becomes numb, but she does drive when necessary.  (R. 30).  She testified that she is unable to walk her dogs anymore, and that her daughter does most of the housework.  (R. 45).  She cooks occasionally, and is able to straighten rooms, vacuum and dust.  (R. 44).  She can no longer roller skate, bike, or grocery shop.  (R. 45).  She is able to shop for single, light items such as a loaf of bread or milk.  *Id*.  She alleges that she cannot feel small objects with her non-dominant left hand, and cannot lift more than a half of pound with her left hand.  (R. 46).  Numbness in her left hand allegedly causes her to drop objects.  (R. 32).  She claims that she is limited to lifting five pounds with her right side due to neck and shoulder pain.  (R. 47).  Claimant alleges trouble sleeping due to arm pain and numbness.  (R. 45-46).  She naps daily.  (R. 46).  Claimant is not currently being treated for her ailments.  (R. 49).  She claims that she cannot afford treatment.  (R. 33).  She testified that she sometimes takes Advil at night to help her sleep through her discomfort.  (R. 45).

### 3.  <u>Medical History</u>

#### a.  *Claimant's Testimony*

Claimant's chief complaint is pain in her neck, left shoulder, and wrist.  (R. 31-32).  She testified that her wrist pain and numbness stems from a previous carpel tunnel injury and degenerative tendonitis.  (R. 32).  Claimant testified that this pain and numbness, in addition to her neck and shoulder pain, limits her ability to work.  (R. 31-32).  Additionally, in her pain report, she alleged right ankle pain as her primary pain.  (R. 158).  She alleged secondary pain in her left shoulder, arm, and hand.  (R. 160).  She claimed that the anti-inflammatory drugs she used to treat her pain caused reflux and irritable bowel syndrome.  (R. 161).

4

### b.    *Medical Evidence of Claimant's Physical Impairments Considered by the ALJ*

1.    Dr. Michael Prepon

On July 12, 1991, Claimant underwent carpal tunnel surgery, followed by two and a half months of physical therapy.  (R. 214).  Dr. Prepon performed the surgery.  (R. 221).  On January 10, 1992, she underwent left pronator nerve release surgery in her left forearm followed by one and a half months of physical therapy.  (R. 214).  On July 14, 1992, Dr. Prepon diagnosed Claimant with mild tenosynovitis.  *Id*.  Dr. Prepon prescribed a night splint, $B_6$, and Naprosyn for complaints of intermittent numbness and paresthesia in the left hand.  (R. 222).  Claimant underwent an electromyography ("EMG")[1]/nerve conduction study on June 18, 1992 which revealed no evidence of neuropathy in the results.  *Id*.

2.    Dr. David Jacobs

Dr. Jacobs examined the results of Claimant's subsequent EMG /nerve conduction study performed on August 11, 1993.  (R. 222).  He reported that the test was "an essentially normal electrodiagnostic study."  *Id*.

3.    Dr. Dewan Khan

Claimant underwent an MRI of her left shoulder on November 4, 1995.  (R. 221).  The subsequent diagnosis was degenerative tendonitis with no evidence of bursitis or rotator cuff tear.  *Id*.  On November 22, 1995, Dr. Khan reported to Merck, her employer at the time, that Claimant

---

[1] An EMG is used to test the electrical activity of muscles.  As in the present case, an EMG often is performed in conjunction with a nerve conduction study.  EMG testing may reveal carpal tunnel syndrome.  Electromyography, http://www.emedicinehealth.com/electromyography_emg/article_em.htm (last visited July 23, 2009).

suffered from tendonitis of the shoulder with permanent restrictions.  (R. 220).   He prescribed 75 milligrams of Voltaren[2] for two weeks and physical therapy three times per week for four weeks. *Id*.

     4.    <u>Dr. Joseph Leddy</u>

Dr. Leddy examined Claimant on December 8, 1994, January 5, 1995, and September 7, 1995 after she complained of pain in her left side.  (R. 210).  On December 8, 1994, Dr. Leddy documented Claimant's "excellent range of motion of her cervical spine without radicular extension of pain."  (R. 212).  Although Dr. Leddy reported some mild tenderness in her shoulder, he stated that she had good strength and full range of motion in her rotator cuff musculature.  *Id.*  He ordered a repeat EMG and nerve conduction study.  Dr. Noel Jennings performed the EMG on December 22, 1994.  (R. 222).  On January 5, 1995, Dr. Leddy reviewed the negative results of those studies with Claimant, concluding that Claimant suffers from cumulative trauma disorder, which did not require additional surgery.  (R. 211).  On September 7, 1995, Dr. Leddy observed that Claimant still had cumulative trauma disorder.  He reported that she had good range of motion of her cervical spine without radicular extension of pain.  (R. 210). Dr. Leddy recommended an exercise program for strengthening and prevention.  *Id*.  He stated that Claimant is aware that she was not a candidate for further surgery.  *Id*.

     5.    <u>Dr. Stuart Trager</u>

Claimant complained of left shoulder pain that disturbs sleep with numbness in the left upper extremity.  (R. 221).  However, Dr. Trager noted that Claimant was not in acute distress

---

[2] Voltaren is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain and inflammation.  Voltaren, http://www.drugs.com/voltaren.html (last visited July 23, 2009).

and enjoyed full range of motion of the spine.  (R. 222).  She could lift thirty to thirty-five

pounds with her left arm as compared to fifty-five to seventy-five with her right.  (R. 223).  Dr.

Trager diagnosed Claimant with mild fasciitis and recommended a regimen of strengthening and

stretching exercises and anti-inflammatory medication; having surgery was not necessary.  *Id*.

> 6.      Dr. David Myers, Dr. William Tevlin and Dr. Theodora Maio

Claimant was examined by Dr. Myers, Dr. Tevlin, and Dr. Maio at Sall/Myers Medical

Associates, P.A.  (R. 215).   Her initial examination at the facility was on June 10, 1993.

(R. 214).  On November 6, 1999, she was re-examined there and diagnosed with post-traumatic

injury.  *Id*.  She complained of severe left wrist pain with pins and needles sensations and

shooting pain into the left arm and shoulder.  (R. 218).  In assessing her wrist, the physicians

noted that the left upper extremity presented volar scarification extending across the wrist with

marked percussion and palpation tenderness through the volar aspect.  (R. 214).  Claimant had

characteristic lancinating pain extending into the second finger.  *Id*.  Additionally, the report

documented paresthesia through the thenar eminence and through the distal portion of the palm,

involving the first and second fingers.  *Id*.  The physicians noted an increase in orthopedic

disability of the left hand from fifty-five percent in 1993 and seventy-five percent in 1996 to

eight-five percent in 1999.  (R. 215).  According to the report, her hands were 30% disabled in

1999.  *Id*.

> 7.      Emergency Room Physicians

Claimant visited the Raritan Bay Medical Center emergency room for pain in her left

shoulder on three occasions: November 1999, December 20, 1999 and March 30, 2000.   In

November 1999, Dr. Poco examined Claimant and noted her carpal tunnel syndrome.   (R. 248).

7

Claimant received a prescription for Flexeril.[3]  (R. 249).  On December 20, 2000, Dr. Dogra

prescribed Flexeril for shoulder and neck pain.  (R. 246).  On March 30, 2000, Dr. Krishman was

on duty in the ER and diagnosed her with degenerative tendonitis.  (R. 242).  He ordered an x-ray

and prescribed Flexeril.  (R. 243).  Claimant left against medical advice before receiving the x-

ray report because she claimed she was in too much pain to wait for the results, even though she

had been prescribed pain medication.  (R. 244).

8.    Dr. Joseph Vitolo

Dr. Vitolo initially examined Claimant on December 28, 1999.  (R. 254).  He found that

although she has carpal tunnel syndrome, she was not disabled.  *Id*.

9.    Dr. Albert Tedeschi

On February 17, 2000, Dr. Tedeschi conducted a normal examination of the right

shoulder.  (R. 233).  Most importantly, the left grip strength was 4+/5.  *Id.*  In a subsequent report

on February 25, 2000, Dr. Tedeschi noted a straightening of the normal cervical lordosis

consistent with muscle spasm.  (R. 230).

10.    Dr. Betty Vekhnis

On February 20, 2000, Dr. Vekhnis's reported pos tinel and phalen's at Claimant's left

wrist.  (R. 228).  Dr. Vekhnis stated that although "she presented with multiple subjective

complaints,  [there was] no strong orthopedic findings for acute pathology on today's exam."

(R. 229).  The range was preserved in all joints, and she had a "slightly decreased grip strength"

with the left, non-dominant hand.  *Id.*

---

[3] Flexeril is a muscle relaxant prescribed to relieve muscle stiffness and pain.  Flexeril,
http://www.drugs.com/pdr/flexeril.html (last visited July 22, 2009).

11.   Dr. R.T. Walsh's Residual Functional Capacity Evaluation

On March 18, 2000, Dr. Walsh conducted the Residual Functional Capacity (hereinafter "RFC") Assessment and found her primary condition was carpal tunnel syndrome and her secondary condition was degenerative tendonitis. (R. 234). The doctor concluded that her "subjective complaints are not consistent in severity with objective findings." (R. 239). No other restrictions were evident. *Id*. Therefore, Claimant received a letter on March 21, 2000 denying her claim because she had (1) no severe muscle weakness or loss of feeling in the limbs, and (2) she was able to return to work as a cook. (R. 256). In response, Claimant submitted a request for reconsideration on April 17, 2000 without submitting additional evidence. (R. 7). Dr. Walsh re-examined Claimant and confirmed that Claimant was not disabled despite a finding of left shoulder pain status post carpal tunnel syndrome. (R. 199). Dr. Walsh concluded that Claimant had a moderate impairment rating of three. (R. 202). In May 2000, a report confirmed that Claimant's range of motion was preserved in all joints and there was no focal atrophy. (R. 204). Her grip strength in her left hand was slightly decreased. *Id*. Because of her moderate impairment, Dr. Walsh concluded that Claimant had the residual functional capacity to perform medium work and could return to a previous job. *Id*.

On May 30, 2000, the SSA denied her claim for disability because it found (1) Claimant was able to stand, sit, use arms, hands, and move about well enough to work, (2) Claimant had no other limiting condition, and (3) Claimant could return to her job as a lab service person. (R. 204). On September 20, 2000, Claimant requested a hearing in front of the ALJ. (R. 266). In her request, she alleged that her condition worsened due to arm numbness; however, she did not see a physician. (R. 205).

9

## II.      LEGAL STANDARD FOR DISABILITY BENEFITS

Claimant's eligibility for DIB and SSI is governed by 42 U.S.C. §§ 423 and 1382(a)-(b), respectively.  A Claimant is eligible for DIB and SSI if he meets the disability period requirements of 42 U.S.C. § 416(I), and demonstrates that he is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  A person is disabled for these purposes if his physical or mental impairments are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a Claimant is disabled.  20 C.F.R. § 404.1520.  For the first two steps, the Claimant must establish (1) that he has not engaged in "substantial gainful activity" since the onset of his alleged disability, and (2) that he suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. § 404.1520(a)-(c).  The Claimant bears the burden of establishing these first two requirements, and the failure to meet this burden automatically results in a denial of benefits.  *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).

If the Claimant satisfies his initial burdens, the third step requires that he provide evidence that his impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("listings").  20 C.F.R. § 404.1520(d).  If Claimant's impairment or

combination of impairments meets or equals a listed impairment, he is presumed to be disabled and is automatically entitled to disability benefits. *Id.* If he cannot so demonstrate, the benefit eligibility analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the Claimant's "residual functional capacity" sufficiently permits him to resume his previous employment. 20 C.F.R. § 404.1520(e). "Residual functional capacity" is defined as "that which an individual is still able to do despite limitations caused by his or her impairments." 20 C.F.R. § 404.1520(e). If the Claimant is found to be capable of returning to his previous line of work, then he is not "disabled" and not entitled to disability benefits. 20 C.F.R. § 404.1520(e). Should the Claimant be unable to return to his previous work, the analysis proceeds to step five. To determine the physical exertion requirements of work, jobs are classified as sedentary, light, medium, heavy, and very heavy.

At step five, the burden shifts to the Commissioner to demonstrate that the Claimant can perform other substantial gainful work. 20 C.F.R. § 404.1520(f). If the Commissioner cannot satisfy this burden, the Claimant shall receive social security benefits. *Yuckert*, 482 U.S. at 146-47 n.5.

## III.   STANDARD OF REVIEW

The standard under which the District Court reviews an ALJ decision is whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). "[M]ore than a mere scintilla," substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted). The inquiry is not whether the

reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Substantial evidence, therefore, may be slightly less than a preponderance.  *Hanusiewicz v. Bowen*, 678 F. Supp. 474, 476 (D.N.J. 1988).

The reviewing court, however, does have a duty to review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).  As such, "a court must take into account whatever in the record fairly detracts from its weight."  *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (internal quotations omitted).  The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987).  As the Third Circuit has instructed, a full explanation of the Commissioner's reasoning is essential to meaningful court review:

"Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (internal quotations omitted).  Nonetheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).

## IV.     DISCUSSION

### A.     The ALJ's Decision

In his decision (R. 270-83), the ALJ properly applied the requisite sequential evaluation and considered all relevant evidence put before him.  The decision includes evaluation of Claimant's subjective complaints as well as the objective medical findings related to her conditions.

At step one of the sequential evaluation, the ALJ determined that Claimant had not engaged in substantial gainful activity since October 1, 1999 because her monthly earnings were below the $700 threshold reflective of substantial gainful activity.  (R. 271).  Therefore, the ALJ moved to the second step of the evaluation.  At step two, the ALJ concluded that the evidence established the existence of a "severe" impairment or combination of impairments.  (R. 272).

> The medical evidence does establish that from October 1, 1999 through November 9, 2001, the Claimant had post-operative left carpal tunnel syndrome, as well as recurring left shoulder/neck sprain/strain with diffuse left shoulder synovitis superimposed upon a history of degenerative tend[on]itis of her left shoulder and myofascitis.  A history of bilateral carpal tunnel release surgeries and left pronator nerve release surgery between 1988 and 1992 was reported.  The physical examinations of her left forearm during the period at issue revealed adherence, tenderness and sensory changes in and surrounding the zone of operative scarification extending across the volar aspect of the wrist, positive Tine's and Phalen's signs at the wrist, grip strength rated as 4+/5, complaints of paesthesia through the tops of the fingers upon attempted full grasp, complaints of pulling and pain at the extremes of finger motion, patchy sensory changes to light touch and pinprick mostly over the thumb and fourth finger and intermittently decreased wrist motion (Exhibits 1f-4F and 6F).  (R. 271).

Based on this evidence, the ALJ found that Claimant had "impairments [which] significantly affected the Claimant's ability to perform basic work activities.  Accordingly, the claims [could not] be disposed of at the second step of the sequential evaluation."  (R. 272).

However, at step three, the ALJ found that "such impairments, singly or in combination, failed to meet or medically equal one of the listed impairments in 20 CFR. 404, Subpart P, Appendix 1, Regulations No. 4." (R. 281). The ALJ stated:

> No medical source has suggested that the criteria for any listing were met or equaled. Moreover, the [ALJ's] own perusal of the evidence reveals that the criteria of the most similar sections of Appendix 1, 1.02 (Major dysfunction of a joint) and 1.08 (Soft tissue injury), were not satisfied. There was no medically acceptable imaging study showing joint space narrowing, bony destruction or ankylosis of the left wrist or shoulder. No imaging study of the wrist is in evidence and the left shoulder x-ray in connection with the February 2000 consultative examination was interpreted as normal. There is no medical evidence that the right forearm was affected during the period at issue . . . the Claimant testified at the initial hearing that she had no problem with her right hand. (R. 272).

At step four, the ALJ determined that Claimant had the residual functional capacity to perform medium exertion work, except for lifting more than 50 pounds occasionally or more than 25 pounds frequently, and nonexertional work other than using her non-dominant hand to reach repetitively, reach overhead, exert grip strength greater than 4/5 and "feel objects without interference from occasional numbness in the hand." (R. 282). In reaching this conclusion, the ALJ evaluated the medical evidence and considered Claimant's subjective complaints of disabling pain and numbness. (R. 278). The ALJ found that while Claimant's subjective allegations might reasonably be attributed to her objective pathology, medical records did not support the extent to which she claimed injury. *Id*. The ALJ found her complaints to be inconsistent with the record as a whole. *Id*.

Despite subjective complaints of pain in the neck and shoulders, "there was no objective evidence of any pathology emanating from the cervical spine or right shoulder." (R. 272).

14

According to her medical history, her isolated shoulder pain incident occurred on November 30, 2001, which is after the period at issue for this decision.  *Id.*  Similarly, Claimant's complaints of low back impairment and mental impairment were documented in her second application in September and November of 2002, and therefore cannot be construed as materially relevant to this decision.  (R. 273).   Thus, "although the objectively documented left wrist and left shoulder/neck impairments could reasonably have been expected to cause some pain, numbness, and/or weakness at the left shoulder/neck and/or left hand, the Claimant's allegations of debilitating pain, numbness and weakness were not consistent with the objective medical evidence and other evidence as a whole."  (R. 281-82).

The ALJ also found that other evidence suggests that she exaggerated her condition.  In particular, she did not see a physician for her ailments with the exception of a series of three emergency room visits from November 1999 through March 2000.  (R. 277).  At those visits, she complained of "on and off" shoulder pain, not consistent with disabling pain.  *Id.*  Claimant testified that she did not receive treatment because she could not afford medical care; yet, she owned and cared for four cats and three dogs. (R. 276).  Additionally, she received child support for her daughter and testified that she collected unemployment benefits. (R. 43).  In order to receive unemployment insurance benefits, she represented to the Department of Labor, in April 2000, that she was able to work.  (R. 277).  The ALJ concluded that her explanation for the lack of treatment "was not very credible."  (R. 276).

The ALJ further found that Claimant's allegation that her upper left extremity was too weak to assist the right upper extremity for any significant length of time was contradicted by the physicians' reports.  (R. 281-82).  Specifically, she testified that mere contact with an object such

15

as an envelope caused her pain.  *Id*.  The ALJ noted in his decision that this allegation was
inconsistent with the main issue of numbness in Claimant's left hand.  *Id*.  Furthermore,
examining physicians concluded that Claimant could perform all other work-related activities to
an unlimited extent, including upper extremity manipulation less than 4/5 grip strength.  (R. 282).

The ALJ concluded that Claimant could not return to her prior relevant work as a
laboratory service person, cashier and cook.  *Id*.  However, the ALJ found that Claimant has an
RFC in the medium range, significantly eroded by nonexertional limitations.  *Id*.  Giving weight
to the vocational expert's ("VE") testimony in step five of the analysis, where the burden shifted
to the SSA to show that there were other jobs existing in the national economy that she could
perform, the ALJ found that the Claimant could work as a parts sorter, scaler, weld inspector and
label machine operator, which exist in significant numbers in the national economy.  *Id*.
Moreover, the ALJ found that Claimant could work in sedentary occupations as a coil inspector,
sorter, and surveillance systems monitor, which also exist in significant numbers in the local and
national economy.  *Id*.

Based in large part on the VE's testimony, the ALJ concluded that Claimant was capable
of performing such work and therefore, was not disabled under the Social Security Act.  *Id*.
Therefore, even if the Claimant was unable to return to her prior occupation, she would not be
disabled as she is capable of performing alternative jobs existing in significant numbers in the
local and national economy.

**B.**    **Claimant's Arguments**

**1.**    **Challenges to Step Three**

Claimant challenges the ALJ's analysis at steps three though five.  Generally, Claimant

16

argues that (1) there is substantial evidence in the record establishing eligibility for disability benefits and (2) the Commissioner's final administrative decision is not based on the substantial evidence of the record.

Specifically, Claimant argues that the ALJ violated SSR 83-20, which sets forth factors to analyze in determining the disability onset date, and disregarded the holding of *Walton v. Halter* by failing to call a medical advisor to determine the onset date of Claimant's disability.  Claimant argues that the ALJ failed to articulate why he found that Claimant was totally disabled on November 10, 2005 yet capable of "the full range of medium work activity . . . [which requires] lifting 50 pounds three hours a day and 25 pounds five hours a day." (Pl.'s Br. 16).

Claimant's argument that the ALJ violated SSR 83-20 is not supported by *Walton v. Halter* because the instant case is distinguishable.  First, in *Walton*, the Claimant suffered from bipolar disorder, but the onset date was not easily identifiable.  This is in contrast to the case at bar where Claimant's physical ailments are clearly documented.  Furthermore, there were no adequate medical records for the relevant period in *Walton*, whereas in the present case, the medical evidence is not ambiguous.[4]  Here, there are medical records throughout the relevant period at issue.  Moreover, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed'l Maritime Comm'n*, 383 U.S. 607, 620 (1996) (citations omitted).  The Congressional intent behind this standard of review is deference to "the expertise of the administrative tribunal" and "uniform application of the statute."  *Id*.  Therefore, in the

---

[4] *See Grebenick v. Chater*, 121 F.3d 1193, 1201 (8th Cir. 1997) (holding that "[i]f the medical evidence is ambiguous . . . , SSR 83-20 requires the ALJ to call upon the services of a medical advisor to determin[e] . . . onset" date.)

case at bar the Court finds that the ALJ's conclusion is supported by substantial evidence, and that conclusion is unaffected by a subsequent ALJ's decision.  For the aforementioned reasons, the ALJ was not obligated to call on a medical expert to determine the onset date of Claimant's disability.

Next, the Claimant misstates the ALJ's decision.  The ALJ concluded that during the only period under review, "based on her record as a whole, from October 1, 1999 through November 9, 2001 despite her medical impairments, the Claimant retained the residual functional capacity to perform the exertional requirements of work *other than* lifting and/or carrying more than 50 pounds occasionally or more than 25 pounds frequently and the nonexertional requirements other than using her left upper extremity to grip with greater than 4/5 strength, reach repetitively for an extended period of time, reach overhead or feel small objects without interference from occasional numbness in the hand." (R. 279).

The Court finds that substantial evidence in the record supports the ALJ's conclusion that Claimant's residual function capacity exceeds the limited capacity from which she claims to suffer.  First, the ALJ inferred that Claimant lacked credibility from her testimony at the hearing. Claimant's complaints vacillated from left hand hypersensitivity, to pain, to numbness, and to pain again, yet she "[moved] both upper extremities extensively in the course of her work, and did not complain of hand discomfort on the few occasions on which she sought treatment during the period in question."  (R. 278).  On these occasions, Claimant visited the emergency room for shoulder and neck pain.  (R. 246).

Second, the medical evidence in the record supports a residual functional capacity for medium work, as defined in the Dictionary of Occupational Titles and the Social Security

Administration regulations pursuant to 20 C.F.R. §§ 404.1567(c) and 416.967(c), "to involve lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 20 pounds."  (R. 279).  Upon examination of the Claimant, Dr. Trager reported that she had full range of motion of the spine, and that she could lift thirty to thirty-five pounds with her left arm and fifty-five to seventy-five with her right.  (R. 223).  Dr. Trager recommended strengthening exercises for treatment.  *Id.*  In his March 2000 RFC Assessment, Dr. Walsh reported that Claimant suffered from carpal tunnel syndrome and degenerative tendonitis.  (R. 234).  He found no other restrictions, and therefore concluded that Claimant had a moderate impairment limiting her residual functional capacity to medium work.  (R. 204).  In May 2000, Dr. Walsh re-examined Claimant and confirmed his assessment that she was not disabled.  (R. 199).

Accordingly, Claimant's reliance on SSR 83-20 and *Walton* is misplaced.  As such, the Court finds that the ALJ's analysis must be sustained because the record contains substantial evidence to support his decision.

### 2.     Challenges to Step Four

Claimant argues that at step four of the sequential evaluation the ALJ discredited Claimant's complaints because "she claimed inability to afford necessary medical care for herself, [although] she maintained four cats and three large dogs which must have been a significant cost."  (R. 276).

The Court finds that the ALJ's conclusion that Claimant could afford, or at least had access to, medical care is supported by substantial evidence in the record.  The ALJ cites Claimant's testimony that she received medical care at a clinic.  *Id.*  Additionally, Claimant received a salary from October 1999 through April 2000, unemployment insurance benefits from

April 2000 through February 2001, and child support payments for her daughter. *Id*. Claimant

testified that she was financially prohibited from receiving medical care for her numerous

ailments. *Id*. The ALJ's comment regarding Claimant's pets was made when considering her

claim that she was unable to afford necessary medical care, when the record clearly showed that

she had some income and access to clinical care. Conversely, the record suggests that the

Claimant did not seek regular medical care because she was not, as she claims, in constant and

severe pain. (R. 277). Although she testified that she left her job as a Denny's line cook because

she was in too much pain, she represented to the Department of Labor that she was ready and

willing to work in order to receive unemployment benefits. *Id.*

When she did seek medical care, she did so at the emergency room and complained of

"on and off" left shoulder pain, not constant, severe pain. *Id.* Moreover, she left the hospital

against medical advice after one of these visits, on March 30, 2000. (R. 33). She testified that

she left because she was in so much pain. *Id.* However, as the ALJ pointed out, "it is difficult to

believe she was in too much pain to follow medical advice and await the x-ray report, given that

she had tolerated her pain for four days before going into the emergency room and that Flexeril,

which, by her account, had helped similar complaints in the past." (R. 278). Therefore, the

Court finds that the Claimant's challenge to Step Four exaggerates the weight of the comment

made by the ALJ in his analysis highlighting the inconsistencies in Claimant's testimony.

### 3.   Challenges to Step Five

Claimant argues that the ALJ violated the holding in *Chrupcala v. Heckler*, alleging that

the ALJ did not include all of the Claimant's documented restrictions in his hypotheticals.

Specifically, Claimant argues that the ALJ failed to include "the numbness in both hands from

his previous hypotheticals so as to craft the existence of jobs." (Pl.'s Br. 17). However, the Court finds that the ALJ articulated an evidentiary basis for his RFC determination and that determination is supported by substantial evidence. An RFC determination reveals the most a person can do despite her limitations. 20 C.F.R. § 404.1545(a). In assessing RFC, the ALJ must consider all relevant evidence including "medical records, observations made during formal medical examinations, descriptions of limitations by the Claimant and others, and observations of the Claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). The ALJ's RFC determination "must be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id.* (citing *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

In his analysis, the ALJ stated which substantial evidence he gave particular weight to and which he discounted and explained his reasons. *See, e.g.*, R. 281 (the ALJ noted that he was "not persuaded by the Claimant's testimony . . . that she would not be able to use her left upper extremity, even just to assist the right upper extremity by guiding very light objects like envelopes . . . there had been no prior allegation of hypersensitivity of the hand to touch." Additionally, she "did not complain of hand discomfort on the few occasions on which she sought treatment during the period in question.") There is no evidence in the record that Claimant suffers from numbness in both hands. In fact, the VE stated, "as long as she had one upper extremity that she could grasp things with, I wouldn't see any limitation." (R. 447). Medical evidence in the record shows that her left hand has a grip strength of 4/5. Further, the VE stated, "[t]hese types of jobs that I've given are jobs that can be done by a person without limited reaching with one upper extremity." (R. 459). The ALJ found the VE's testimony to be consistent with the objective medical evidence in the record. Moreover, the VE clarifies that "if

21

the person has absolutely no use of [the other] extremity, then . . . they would not be able to do the job." (R. 462). However, there is no evidence in the record to suggest that she has no use of either or both extremities.

Claimant argues that the ALJ failed to ask hypotheticals "which reflected Claimant's true condition and when such questions were posed, [and] the VE testified that Claimant could not work . . . those questions and those responses . . . were omitted from the ALJ's second decision." (Pl.'s Br. 18). Claimant's argument is incorrect, however, because the ALJ does address the medically supported limitations, such as numbness in the left hand. The ALJ stated in his opinion that:

> At the supplemental hearing, the vocational expert . . . was presented with a hypothetical assuming an individual who could perform "medium" work, as defined in the regulations, and had the following nonexertional limitations: the non-dominant hand having reduced strength to 4/5, inability to reach repetitively with the left upper extremity for an extended period of time, inability to reach overhead with the upper left extremity and occasional numbness in the left hand affecting the ability to feel. (R. 279).

Accordingly, the Court finds that the ALJ's hypotheticals were consistent with the reality of the Claimant's limitations, as qualified above by the VE and supported by the medical evidence. The ALJ proffered that the individual's non-dominant hand had reduced strength of 4/5. This hypothetical comes directly from Dr. Tedeschi's report on February 17, 2000, in which he cited Claimant's left grip strength as 4+/5. (R. 233). Additionally, Dr. Vehnkis reported that Claimant had a "slightly decreased grip strength" in her left hand, although the range of motion was preserved in all joints. (R. 229). Therefore, the ALJ posed hypotheticals that accurately reflected the Claimant's condition.

22

## V.      CONCLUSION

For the foregoing reasons, the Court concludes that substantial evidence supports the

ALJ's decision denying Claimant's request for SSDI and SSI benefits, and affirms the

Commissioner's final decision.  An appropriate order accompanies this Opinion.


                                        /s/ Joel A. Pisano
                                        JOEL A. PISANO, U.S.D.J.

_____

Dated: July 30th, 2009